UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYUNG JONES,<br>　　　　　Plaintiff,<br>　v.<br>MEGAN J. BRENNAN,<br>　　　　　Defendant. | Case No. 18-cv-07569-HSG<br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 28 |

Pending before the Court is Defendant's motion for summary judgment. *See* Dkt. No. 28 ("Mot."), 37 ("Opp."), 42 ("Reply"). For the reasons noted below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

## I. BACKGROUND

Plaintiff Kyung Sook Jones began working at the United States Postal Service ("USPS") in Eureka, California, in 1986. Dkt. No. 30-1 ("Jones Depo.") at 13:19–23. She worked as a letter carrier, but due to two workplace injuries (one in 1988 and one in 2003), Plaintiff has been on "limited duty." *Id.* at 13:23–15:6. She is limited to working for six hours a day and receives two hours of compensation per day from the Office of Workers' Compensation Programs ("OWCP") at a fixed pay rate from 2003. *Id.* at 73:14–25; 76:5–17. While Plaintiff is able to work six hours, USPS does not guarantee her six hours given that she is on limited duty. *Id.* at 101:13–19. Plaintiff's tasks included organizing mail by address and putting it in the order it will be delivered (referred to as casing and pulling down mail), entering forwarding orders into the computer system and preparing forwarding stickers for each route, and collecting undeliverable business junk mail and sorting it to remove any first and second class mail that may have gotten mixed in (a task referred to as UBBM), among others. *Id.* at 32:2–37:25. Each day a supervisor would give Plaintiff a job assignment based on the tasks needed for that day. *Id.* at 33:15–19.

In the Eureka Post Office, each route of mail delivery is assigned a letter carrier and a staging area (referred to as a cage). *Id.* at 36:24–37:1. The letter carrier is responsible for casing and pulling down mail for the route each day, and later delivering the mail. If a letter carrier is on light or limited duty, he or she may continue to case and pull down their assigned route, but typically will not deliver the mail. Plaintiff does not have her own route and will case and pull unassigned routes or routes assigned to individuals who are not present due to sickness or annual leave. *Id.* 33:15–34:17.

Plaintiff points to a number of incidents, beginning in November 2015, that form the factual bases for her claims. The Court notes each alleged incident below:

- November 13, 2015 Incident: Plaintiff was working on sorting UBBM when a co-worker, Joe Warren, who was on light duty at the Eureka Post Office, told Plaintiff that he had finished sorting his UBBM. Jones Depo at 30:1–31:19. Plaintiff understood this to mean that Warren was asking her what he should do next, and she told him that he needed to go ask his then-supervisor, Heather McTigue. *Id.* Warren responded by walking away and saying "in a very stern, very threatening, very angry" voice that they were "going to have a problem." *Id.*
- November 16, 2015 Incident: Plaintiff had finished casing and pulling down mail for several routes and proceeded to collect UBBM. She went to the Route 45 cage "where [she had] normally done [her] UBBM for a long time," but found Warren using the cage even though he had an assigned route and cage. *Id.* at 49:9–10. Plaintiff asked Warren to move, he refused, and then stood up "really fast" and "stood over" Plaintiff, telling her that he had heard she complained to the union because he was sorting UBBM. *Id.* at 49:15–25. Plaintiff then went to McTigue's office to complain about what had just happened. *Id.* at 51:6–25. Plaintiff claims that McTigue responded with indifference, stating it was "no big deal," and was generally dismissive of Plaintiff's complaint because she favored Warren, who is white. *Id.* When Warren was brought into the room, he claimed that he either had not heard her or did not understand when she requested that he move. Plaintiff noted that she was speaking English, to which Warren pointed at her and said, "[D]on't play the race card." *Id.* at 54:6–10, 56:6–58:2. Plaintiff also stated that McTigue pointed at Plaintiff at this time. Plaintiff then started feeling sick and left to return to work. McTigue followed Plaintiff back to the Route 45 cage, and instructed her to move to Route 13 cage, located near her desk. *Id.* at 59:6–17; 61:6–16. Plaintiff also noted that other light or limited carriers were not confined to one spot to do UBBM, but that she was required to do so at Route 13. *Id.* at 61:6–16.
- November 18, 2015 Assignment Change: Plaintiff identified two other carriers also on limited duty: Dick Clark ("RGC") and Jessica Baslor ("JAB"). Dkt. No. 1 ("Compl.") at 8. On November 18, 2015, McTigue assigned RGC and JAB casing and pulling down mail duty and instructed Plaintiff to only sort UBBM. Plaintiff believes this was because McTigue was unhappy due to the November 16, 2015 Incident and because Plaintiff had "normally case[d] more routes than any other carrier in the office because [she's] fast." Jones Depo. at 33:23–24, 68:12–23.

2

- February 2016 Incident: Sometime in February 2016 after Plaintiff initially notified the postmaster of her intention to file a complaint with the Equal Employment Opportunity Commission ("EEOC"), McTigue told Plaintiff "[t]wo, three times" to work in an unsafe corner next to Warren's desk. *Id.* at 84:18–85:8. At this desk, there was no emergency exit and Plaintiff was blocked in by two heavy carts ("1075 carts") and could not get out without Warren moving out of his chair to move the 1075 carts. *Id.* at 85:8–86:8. This area was additionally humiliating because all her co-workers could see that she was forced to sit there. Plaintiff later spoke with a safety inspector that was in the office who noted that the corner was unsafe, after which Plaintiff was no longer required to sit in the corner. *Id.* at 87:4–88:16.
- February 10, 2016 Incident: When Plaintiff was heading to the front office, she heard someone yell her name angrily. She turned to find Warren "across the room with a frown on his face, using his hand to motion [her] to come to him. [She] started to walk towards him, and he continued to stand there in a menacing way as [she] walked." Compl. at 9–10.
- February 19, 2016 Incident: Plaintiff sought to complete a form CA-2, Notice of Occupational Disease and Claim for Compensation, in order to complain about ongoing harassment from McTigue and Warren. McTigue gave Plaintiff the form and agreed that she should complete the form in the break room. Jones Depo. at 78:16–22. Warren followed her to the breakroom, pointed at her and screamed that she needed to do the form on the work floor and not in the break room. *Id.* at 78:22–25. Plaintiff gathered her papers and moved to Route 33, where Warren again told her she needed to move to Route 13, next to his desk. *Id.* 78:15–25. Plaintiff was then too upset to focus on the form. *Id.* at 80:9–12.
- May 23, 2016 EEOC Complaint: Plaintiff filed a formal EEOC complaint alleging discrimination by the USPS on the basis of race, national origin, disability, and age. Dkt. No. 30-8, Exhibit H at 2–3. The EEOC granted summary judgment for Defendant, which was affirmed on appeal. *Id.* at 2–4.
- June 2016–onwards Assignment Change[1]: Plaintiff states that she was sent home early due to a lack of work, while her two white co-workers who were also on light and limited duty, RGC and JAB, were not told to go home early. Compl. at 11. Plaintiff estimates that from June 2016 to December 2016, there were twenty days that she was sent home early for no work available. Opp. at 8.
- September 20, 2017 Incident: When Plaintiff was casing a route, Warren ordered Plaintiff to sign a form #3971 (a leave request form). Plaintiff expressed that the hours on the form were wrong and refused to sign the form. Warren responded by telling Plaintiff that she "was refusing an order, and then said in a loud bullying voice to turn around." Compl. at 11.
- Other Incidents: Plaintiff also points to other incidents, although dates and details of some are limited or involve other coworkers.
    - Once, the postmaster asked Plaintiff to help another employee, John Hoffman dispose of paperwork. Warren approached Plaintiff while she was helping and

---

[1] Although some records indicate a start date of November 16, 2015 for this action, *see* Dkt. No. 30-8 at 3, Defendant acknowledged at the hearing that Plaintiff contends that she also was sent home early after filing the EEOC complaint. *See* Compl. at 11. Plaintiff's declaration also says that "since June 2016, I'm regularly being sent home early due to the lack of work." Dkt. No. 37 ("Jones Decl.") at ECF 10.

- told her that she needed to do something else, that "[w]hat [she was] doing [was] useless." *Id.* at 77:12–78:5. At this point, Warren had been promoted to supervisor. *Id.*
  - One two or three occasions, Warren spoke to Plaintiff in Spanish. Plaintiff stated that she told Warren that she is Korean and does not speak Spanish, but he continued to do this "just to harass[ her]." *Id.* 83:20–84:10.
  - Warren also made "racial comments about other workers such as telling an African American [c]arrier that he was 'slow as molasses' and to a Hispanic [c]arrier who was looking for his paycheck, 'What do you think we are the Welfare department.'" Dkt. No. 30-9 at 12.
  - On March 25, 2015, a co-worker, Cheryl Cudney, was throwing mail "nearly hitting" Plaintiff and yelled at Plaintiff. A supervisor was sitting close by and did nothing to intervene. Dkt. No. 30-9 at 37.
  - On July 31, 2019, Plaintiff was in the breakroom when a co-worker yelled, "Blacks are taking over the country," and "Mexican people are crossing the US border we are not going to have health insurance." Opp. at 10.[2]

Outside of these specific incidents, Plaintiff alleges that the supervisors have been watching her closely, monitoring her breaks, and generally creating a difficult work environment. *See e.g.*, Dkt. No. 30-9 at 16–17.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the

---

[2] The Court is not required to consider Plaintiff's allegations raised for the first time in her Opposition brief. For completeness, the Court nonetheless includes them here.

4

moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

### III. ANALYSIS

Defendant argues that summary judgment is appropriate as to all of Plaintiff's alleged causes of action. *See generally* Mot. First, Defendant argues that Plaintiff cannot establish a prima facie case of disparate treatment under Title VII because she fails to establish an adverse employment action and that similarly situated individuals outside of her protected class were treated more favorably. *Id.* at 11–16. Second, Plaintiff cannot establish a prima facie case of age discrimination. *Id.* at 16–17. Third, Plaintiff cannot establish a prima facie case of disparate treatment based on disability under the Rehabilitation Act. *Id.* at 17. Fourth, Plaintiff cannot show a hostile work environment based on gender, race or national origin. *Id.* at 17–21. Finally,

5

1    Plaintiff cannot establish retaliation under Title VII, the Age Discrimination in Employment Act ("ADEA"), or the Rehabilitation Act. *Id.* at 21–23. Plaintiff does not dispute Defendant's identification of her causes of action. *See generally* Opp. Accordingly, the Court addresses each argument in turn.

### A. Disparate Treatment under Title VII

"In order to prevail in a Title VII case, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2, 2004). To establish a prima facie case, a plaintiff "must offer evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* [411 U.S. 792 (1973)] or with direct or circumstantial evidence of discriminatory intent." *Id.* (quoting T*exas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Under the *McDonnell Douglas* framework, a plaintiff must establish that "(1) the plaintiff belongs to a protected class, (2) [s]he was performing according to h[er] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 691 (9th Cir. 2017).

Defendant first argues that Plaintiff fails to establish that she suffered an adverse employment action. Mot. at 12–15. The Court agrees this is true for many of the alleged incidents. "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000)). The only incidents that could fall within these categories are changes to Plaintiff's assignments by removing casing work and sending Plaintiff home early due to a lack of work. The remainder of the alleged wrongful actions cannot constitute adverse employment

actions as a matter of law. *See Alexander v. Principi*, 16 Fed. Appx. 755, 757–58 (9th Cir. 2001) ("[V]erbal attacks and demeaning conduct cannot constitute an adverse employment action in the absence of some tangible harm."); *Dupree v. Apple, Inc.*, No. 16-CV-00289-LHK, 2017 WL 2617978, at *10 (N.D. Cal. June 16, 2017), *aff'd*, 715 Fed. Appx. 798 (9th Cir. 2018) (concluding that stray comments by co-workers and minor discipline incidents did not constitute adverse action).

Defendant argues that the change of assignment removing casing work does not constitute an adverse employment action because Plaintiff is not guaranteed casing work under her limited duty position, and because she has not established that UBBM is more burdensome than casing. *See* Mot. at 13–14; *see Davis*, 520 F.3d at 1089 ("assigning more, or more burdensome, work responsibilities, is an adverse employment action."). In addition, Plaintiff does not allege that she had been stripped of all casing responsibilities, only that she was not consistently given casing assignments. *See, e.g.*, Compl. at 7–8, 11 (highlighting specific instances when McTigue removed casing duties, while referencing a subsequent instance when McTigue assigned such duties). The Court agrees with Defendant that the reassignment, as alleged, does not constitute an adverse action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("[R]eassignment to more inconvenient job insufficient" to establish an adverse action that is a materially significant disadvantage) (citing *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)); *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (holding that an action was not "sufficiently final to constitute an adverse employment action" where the reassignment was not permanent); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) ("[A] mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action.). Plaintiff does not allege that Defendant stopped giving her casing work indefinitely or that she was assigned more work overall or even that UBBM is more difficult than casing routes. In fact, the record shows that UBBM work was consistently part of her day-to-day responsibilities and that she was not guaranteed casing work. *See, e.g.*, Jones Depo. at 31:24–25, 35:19–20, 50:5–8, 101:3–6. She only argues that not being assigned casing "felt like a punishment to" her, Compl. at 8, and was "highly unusual and hadn't happened in over a decade," Jones Decl. at ECF 6. This

7

does not constitute a material change in employment conditions.

On the other hand, making all reasonable inferences in her favor at this stage, Plaintiff being sent home early could constitute a material change since it directly affected her substantive earnings. *See Ray v. Henderson*, 217 F.3d 1234, 1242 (9th Cir. 2000) (finding that a reduced workload resulting in reduced pay constitutes an adverse action). Defendant's only argument against such a finding is that light or limited duty employees are not guaranteed any particular number of hours of work, such that sending them home early cannot constitute an adverse employment action. Mot. at 15. However, even if Defendant was not required to employ Plaintiff for six hours each day, it could be liable if she was sent home for discriminatory reasons. The record on this point establishes a genuine issue of fact as to whether this was an adverse employment action.

Defendant also argues that Plaintiff fails to present evidence that similarly situated employees were treated more favorably. Mot. at 15–16. Even assuming that "limited" duty employees are similarly situated to Plaintiff's "permanent limited duty" status, Defendant points to evidence that from May 30, 2016 to July 1, 2016, Plaintiff worked the highest total hours of the three limited duty employees at the Eureka Post Office. Dkt. No. 29 ("Tucker Decl.") at ¶¶ 8–10. Plaintiff worked a total of 115 hours, while RGC worked 75 hours and JAB worked 101 hours. *Id.* at ¶ 10. Defendant further notes that from July to December 2016, Plaintiff worked 520.80 hours, JAB worked 523.14 hours, and RGC worked 374.26 hours. *See Id.* at ¶ 12. Plaintiff does not dispute these figures or provide any evidence regarding the actual days and times RGC and JAB were permitted to work after she was sent home. Even if Plaintiff was sent home early more than 20 days between June and December 2016, overall, she worked hours higher than or comparable to those worked by the two other employees she says were similarly situated during this same timeframe. Additionally, as Plaintiff concedes, she is not guaranteed six hours on each day. *See* Jones Depo. at 101:13–19.

Plaintiff responds that RBC and JAB have different "job offers," which refers to work limitations established by a doctor, such that the overall hours worked may not be appropriate to assess whether Plaintiff was being treated less favorably than the two other employees. Opp. at

8

13. But this only undermines Plaintiff's claim that she is similarly situated to other employees with different job offers. Further, the record indicates that JAB was permitted to work up to eight hours a day in 2016 and RGC was limited to four hours. *See* Dkt. No. 42-1 ("McTigue Decl.") at 1. This evidence does not support an inference of disparate treatment, since Plaintiff worked more hours than JAB in June, even though she was limited to six hours while JAB was limited to eight, and worked comparable hours between June and December 2016 despite being capped at working two fewer hours each day than JAB.

Finally, Plaintiff argues that she is the most senior limited duty carrier and thus should have received priority over RGC and JAB on a day-by-day basis such that Defendant's decision to send her home on any specific day before RGC and JAB raises an inference of discrimination. Opp. at 9. Plaintiff relies on a discussion with a union representative who indicated that Defendant "should consider" seniority when determining task priority for light or limited duty. *See* Jones Depo. at 101: 7–23. Beyond failing to provide any evidence of a mandatory seniority policy Defendants allegedly violated, this hearsay statement is insufficient to give rise to any inference that the particular decisions Plaintiff challenges were the result of disparate treatment based on any of Plaintiff's protected characteristics.[3] Plaintiff had the opportunity to conduct discovery and obtain evidence of such a policy, if it exists, and yet she presents none.

At this stage, the burden is on Plaintiff to present evidence sufficient to raise a genuine issue of fact as to whether "similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga*, 847 F.3d at 691. Plaintiff has failed to do so. Outside of noting that RGC and JAB are both Caucasian, Plaintiff provides no evidence that her being sent home early on several occasions was motivated by racial discrimination, and her showing fails to create any triable issue as to whether similarly situated employees were treated more favorably. The Court

---

[3] Plaintiff's citation to a 2014 National Association of Letter Carriers ("NALC") grievance memo fails to support the existence of such a policy. The memo notes that the Postal Service has an obligation to accommodate those with job related injuries ahead of those that are ill or have non-job related injuries. Here, both RGC and JAB are limited duty carriers due to workplace injuries. McTigue Decl. ¶¶ 5, 9. The memo does not indicate any seniority policy as between limited duty workers.

9

accordingly **GRANTS** Defendant's motion for summary judgment as to this cause of action.

### B. Age Discrimination

Under the ADEA, a "prima facie case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). Accordingly, where, as here, a plaintiff alleges that he or she was discriminatorily denied working hours, a prima facie case can be established by proving that the plaintiff (i) was a member of the protected class, (ii) was performing his or her job in a satisfactory manner, (iii) was sent home early or otherwise denied hours, and (iv) a substantially younger employee with equal or inferior qualifications was given those working hours. *See Shelley v. Geren*, 666 F.3d 599, 608 (9th Cir. 2012) ("In a failure-to-promote case, a plaintiff may establish a prima facie case of discrimination in violation of the ADEA by producing evidence that he or she was (1) at least forty years old, (2) qualified for the position for which an application was submitted, (3) denied the position, and (4) the promotion was given to a substantially younger person."); *Douglas v. Anderson*, 656 F.2d 528, 532–33 (9th Cir. 1981) ("In an ADEA action based on discriminatory discharge, a prima facie case normally can be established by proving that the plaintiff (i) was a member of the protected class, (ii) was performing his job in a satisfactory manner, (iii) was discharged, and (iv) was replaced by a substantially younger employee with equal or inferior qualifications."). "If the replacement [for those hours] is only slightly younger than the plaintiff, then it is less likely that an inference of discrimination can be drawn." *Douglas*, 656 F.2d at 533. The Ninth Circuit has held that the *McDonnell Douglas* burden shifting framework applies to a motion for summary judgment on claims under the ADEA as well. *Shelley*, 666 F.3d at 608.

Defendant argues that Plaintiff fails to establish a prima facie case under the ADEA because Plaintiff fails to identify an adverse action or present evidence sufficient to support an inference that RGC or JAB was given Plaintiff's working hours when she was sent home early. Mot. at 16–17. For the same reasons noted above, Defendant's argument that no genuine issue of fact exists as to adverse action fails. Addressing its second argument, Defendant presents undisputed evidence that Plaintiff is two years older than RGC and is thirty-two years older than

10

JAB. McTigue Decl. at ¶ 4. The two-year age difference between Plaintiff and RGC is presumptively insubstantial and fails to create an inference of discrimination. *See France v. Johnson*, 795 F.3d 1170, 1174 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015) ("[A]n average age difference of ten years or more between the plaintiff and the replacements will be presumptively substantial, whereas an age difference of less than ten years will be presumptively insubstantial."). Focusing on JAB as a younger employee, Defendant argues that Plaintiff provides no evidence of JAB's qualifications to show that they are equal or inferior to Plaintiff's, or that JAB was given Plaintiff's hours on the days she was sent home early. Reply at 8. The Court agrees that there is no evidence that JAB received the hours. Plaintiff continues to argue that both RGC and JAB were allowed to remain at work when she was sent home early, without differentiating between the two, undermining any argument that a younger employee received the hours because of age-based discrimination. Plaintiff provides no other evidence that age played any role in the decision to send her home early. Without any evidence to raise an inference of discrimination based on age, Plaintiff necessarily fails to establish a prima facie case and the Court **GRANTS** Defendant's motion as to this claim.

### C. Disparate Treatment under the Rehabilitation Act

"To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007). While Defendant concedes that Plaintiff satisfies the first two requirements, it argues that Plaintiff cannot establish a prima facie case because she cannot show that any of the conduct was motivated by discriminatory animus based on Plaintiff's disability. The Court agrees that Plaintiff presents no evidence sufficient to create a genuine issue of fact on this point. Other than simply noting that she was on limited duty, Plaintiff presents no evidence tying Defendant's conduct to Plaintiff's disability in any way. The mere fact of Plaintiff's limited duty status simply does not reasonably support an inference that all, or any, of Defendant's conduct was motivated by the disability. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to this claim.

11

### D. Hostile Work Environment under Title VII

In order to establish a prima facie claim of hostile work environment under Title VII, a plaintiff must establish that (1) he or she was subjected to verbal or physical conduct because of his or her protected characteristic, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. *Manatt v. Bank of America*, 339 F.3d 792, 798 (9th Cir. 2003). The working environment must be "subjectively and objectively" hostile. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). A determination of whether the work environment is hostile includes an assessment of the frequency, severity, and nature of the conduct alleged, including whether it is physically threatening or humiliating as opposed to merely verbally offensive. *See Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, fall into the category of nonactionable discrimination. *See, e.g., Manatt*, 339 F.3d at 798. "The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Brooks*, 229 F.3d at 926.

Defendant argues that Plaintiff fails to offer evidence of conduct sufficiently severe or pervasive to alter Plaintiff's conditions of employment or create an abusive work environment. Mot. at 17–21. Defendant argues that this is the case for both the sex-based hostile work environment claim and the race or national origin-based claim. *Id.* The Court agrees as to both claims.

Plaintiff proffers minimal evidence of a hostile environment based on race or national origin. First, Plaintiff points to the November 2015 interaction with Warren and McTigue, where, taking Plaintiff's version of events as true, Warren indicated that he did not understand Plaintiff, but hurried to defend himself by stating, "Don't play the race card." Jones Depo. at 57:7–10. McTigue did not verbally respond to this comment, but also pointed at Plaintiff. *Id.* Second, Plaintiff relies on the several times that Warren spoke Spanish to her, knowing that Plaintiff did not understand that language. *Id.* at 83:20–84:10. Finally, Plaintiff points to Warren's statements to other co-workers identified above. Opp. at 10. As Defendant notes, "[t]hese comments

12

demonstrate a lack of racial sensitivity," but they do not rise to the level of describing a workplace permeated with racial hostility as required to establish a claim of a hostile work environment. Mot. at 20. Instead, based on the evidence submitted, Warren's actions were infrequent and isolated, limited to three to four relatively minor incidents. There is no evidence on which a jury could find that the actions Plaintiff relies on constituted the severe and harassing conduct necessary to establish a hostile work environment.

This is also the case for any sex-based hostile work environment claim. While "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex," Plaintiff has not even alleged sufficient conduct to suggest "that the harasser is motivated by general hostility to the presence of women in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). The only gender-related remark that Plaintiff has identified is "Warren's comment on how a female co-worker should get a boyfriend to change a flat tire," which fits squarely within the type of simple teasing or offhand comments that are not actionable under Title VII. Opp. at 15; *see also* Dkt. No. 30-9 at 12. Although Plaintiff suggests that this was "one of many offensive and inappropriate comments" that "perpetuat[ed] a work environment tolerant of sexist and demeaning behavior," Plaintiff offers no evidence of such comments. Opp. at 15. Plaintiff falls short of the showing necessary to establish a prima facie claim for a sex-based hostile work environment.

The Court **GRANTS** Defendant's motion for summary judgment as to the hostile work environment claims.

### E. Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee because the employee has taken action to enforce rights protected under Title VII. *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 730 (9th Cir. 1986). To prove a *prima facie* case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) she was subsequently subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. *Dawson*, 630 F.3d at 936 (citation omitted). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the

13

proximity in time between the protected activity and the adverse action." *Id*. (citation omitted). "[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Reynaga*, 847 F.3d at 693 (quoting *Brooks*, 229 F.3d at 928). If a plaintiff establishes a *prima facie* case of unlawful retaliation, then the burden shifts to the defendant to offer evidence "that the challenged action was taken for legitimate, non-discriminatory reasons." *Id*. (citation omitted). If the defendant provides a legitimate explanation, the burden of production shifts back to plaintiff to show that the defendant's explanation is pretextual. *Id*. (citation omitted).

Defendant argues that Plaintiff fails to establish a prima facie case of retaliation because she fails to establish an adverse action and the necessary casual connection between the protected activity and that adverse action. Mot. at 22–23. For a claim of retaliation, Plaintiff need not show that the adverse retaliatory action resulted in "a materially adverse change in the terms or conditions of [one's] employment," but only that it would deter a reasonable employee from complaining. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006). Making all reasonable inferences in her favor, for the reasons discussed above, reducing Plaintiff's working hours meets this standard.

Whether a genuine issue of fact as to the necessary causal connection exists is a close question. Plaintiff began the EEOC process in February 2016 and officially filed her EEOC complaint on May 23, 2016. The EEOC investigative summary states that Plaintiff alleged that she was sent home early due to a purported lack of work before the EEOC complaint was filed. *See* Dkt. No. 30-9, Ex. I at 8 ("On November 16, 2015, and intermittent continuing dates, [Plaintiff] was told that there was no work and was sent home early."). The summary itself, however, cites 20 days that Plaintiff was sent home early between June 2016 and August 19, 2016, all after engaging in the protected activity. *Id.* at 27–28.[4] The issue before the Court is whether Plaintiff has shown with sufficient clarity that the retaliatory action increased in frequency after

---

[4] Plaintiff similarly claims in her opposition that she was sent home 20 days between June and December 2019, and the Complaint included an allegation that she was sent home early for purported lack of work in June 2016. *See* Opp. at 8; Compl. at 11.

14

engaging in the protected activity such that a causal connection could exist. *See McKissick v. City of Reno*, No. 17-CV-00458-MMD-CBC, 2019 WL 3241161, at *13 (D. Nev. July 18, 2019) (finding that a retaliation claim "is not sufficiently supported due to the unclarity [sic] as to causal and temporal proximity" where plaintiff argued that defendant's hostility, the adverse action in question, occurred both before and after the protected activity); *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Although Plaintiff's allegation in the EEOC complaint suggests that the conduct occurred beforehand as well, it details no frequency other than it was "intermittent." On the other hand, Plaintiff's declaration states that since June 2016, she was being sent home "regularly." Jones Decl. at ECF 10. Additionally, all references in the record to specific dates that Plaintiff was sent home early occur after she filed the EEOC complaint. Taking all inferences reasonably drawn from these materials in the record in the light most favorable to Plaintiff, the Court is compelled to find that Plaintiff has shown that a genuine dispute of fact exists (even as it must acknowledge that her claim is extremely thin). Depending on the evidence at trial, a jury might find that the frequency of the conduct increased after filing the EEOC complaint. In addition, the record establishes that McTigue was aware of Plaintiff's intention to file a complaint about the alleged harassment by February 19, 2016, when she gave Plaintiff a form CA-2. Jones Depo. at 78:16–22. She further knew of Plaintiff's EEOC complaint at least within four months of filing. *See* Dkt. No. 30-6, Ex. F (McTigue's affidavit in response to the EEOC complaint signed on September 14, 2016).

Finally, on this record, a jury could reject Defendant's explanation for this change, precluding summary judgment. Defendant reasons that Plaintiff is not guaranteed six working hours every day and that it can send home limited duty employees early if there is not enough work. Thus, Defendant argues that sending employees home early could not be retaliatory conduct. However, a dispute of fact remains as to whether Defendant took such an action for an impermissible reason. Here, giving Plaintiff the benefit of all reasonable inferences, there is a genuine issue of fact as to whether her hours were reduced due to complaining of disparate

15

treatment through the EEOC process. Accordingly, Defendant's explanation fails to resolve the factual dispute and the Court **DENIES** Defendant's motion for summary judgment as to Plaintiff's retaliation claim under Title VII.[5]

## IV. CONCLUSION

Because Plaintiff has shown a single triable issue of fact as to whether she was sent home early in retaliation for the protected activity of pursuing an EEOC complaint, the Court **DENIES** Defendant's motion for summary judgment as to the retaliation claim. The motion for summary judgment is otherwise **GRANTED**.

**IT IS SO ORDERED.**

Dated: February 28, 2020

*[signature]*
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[5] Defendant argues that the Court should limit the time period encompassed by this action to November 2015 through December 2016, the timeframe of the events covered by the EEOC complaint and investigation. *See* Mot. at 12 n.11. However, the Court retains jurisdiction "over allegations of discrimination that either 'fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1480 (9th Cir. 1997) (quoting *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994)). Here, Plaintiff alleges that "since June 2016, [she is] regularly being sent home early due to the lack of work" and continues to face harassment from Warren and McTigue. Opp. at 8, 11–12. Although some instances of these actions occurred after the EEOC complaint was filed, the continuing conduct as alleged could be reasonably expected to give rise to an investigation growing out of the earlier charge of discrimination. The Court thus declines to limit the relevant time period as Defendant suggests.